**E. A. ANDERSON, Appellee,**

v.

**HART–CARTER COMPANY, a Corporation, Appellant.**

**No. 20466.**

United States Court of Appeals, Eighth Circuit.

Sept. 7, 1971.

Stephen G. Olson, Fraser, Stryker, Marshall & Veach, Omaha, Neb., for appellant.

Richard J. Bruckner, of Schrempp & Bruckner, Omaha, Neb., and Charles Yost, of Yost & Yost, Fremont, Neb., for appellee.

Before ALDRICH,* LAY and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

E. A. Anderson, a commission agent for the Hart-Carter Company, brought this diversity action for breach of contract against his principal, alleging that Hart-Carter, a manufacturer of grain dryer equipment, failed or refused to pay him commissions on eleven sales of grain dryers or grain dryer accessories.

* Of the First Circuit, sitting by designation.

The jury awarded Anderson the full amount of his claim, totaling $27,593.90, which sum included a fifteen percent commission for three separate sales consummated by other persons or firms as follows: (1) a single grain dryer to a grain elevator at Yuma, Colorado; (2) two grain dryers to a grain elevator at Hutchinson, Kansas; and (3) a single grain dryer to a grain elevator at Kanorado, Kansas. Hart-Carter prosecutes this appeal urging as its principal contention [1] the insufficiency of the evidence to establish any promise on its part to pay a commission on these three sales, and contending the trial court erred in failing to grant a new trial in whole, or in part.

We take the facts in the context most favorable to the prevailing party. Prior to 1962, Anderson represented the Hess Dryer Company, a well known manufacturer and distributor of grain drying equipment. The Hess Dryer Company merged with the Hart-Carter Company in 1962, and Hart-Carter undertook the manufacture and distribution of Hess grain dryers, as well as its own brands. Anderson continued after the merger as a sales agent for Hart-Carter. For some years prior to and for three years after the merger, Anderson's exclusive selling area included Nebraska, Kansas, and Colorado. Anderson received a fifteen percent commission on all grain dryers which he sold, and a five percent override commission on certain brands of Hart-Carter dryers sold by others in his exclusive area. These grain dryers carry a price tag of between $20,000 and $25,-000 or more. They are generally purchased by commercial grain elevators and grain storage terminals. The buyer generally contracts for the grain dryer on a completely installed or "turn-key" basis, and Anderson generally provided for such installation services when bidding upon proposed contracts.

In February of 1965, Jack Bussell, the sales manager supervising grain dryer sales for Hart-Carter, advised Anderson that other plans had been made for distribution of grain dryers in Kansas and directed Anderson to confine his sales activity to the State of Nebraska. Hart-Carter's plans for distribution in Kansas did not prove fruitful, however, and in May or June of 1966, the local district sales manager for Hart-Carter, Erle Swaim, asked Anderson to contact prospective purchasers in Kansas. He furnished Anderson with "lead" cards listing firms interested in Hart-Carter grain dryers. Anderson testified that Swaim "requested [him], *with protection*, to go down to Kansas, and handle these jobs and go ahead and sell them." Anderson construed this request as offering him the exclusive right to sell Hart-Carter grain dryers to those particular prospects. During that year, Anderson alone, or with Swaim, contacted many of these "leads," and Anderson and Swaim actually consummated some sales. Anderson introduced a letter which Swaim wrote him in January of 1967, in which Swaim commented: "* * * I was glad to bring you back into the Sunflower State to help me sell dryers. We sold a couple, too, without too much difficulty * * *"

Ronald Helsdon succeeded Swaim as district sales manager over Nebraska, Kansas, and Colorado during 1967. The three sales here in question took place during that year. The first sale occurred in May of 1967, when the Coffey-Reid Grain Company of Kanorado, Kansas, purchased a Hart-Carter grain dryer through the Hi-Plains Elevator Machinery Company of Salina, Kansas. Hi-Plains contracted to provide the grain dryer and to make installation on a "turn-key" basis. Hi-Plains, although in the possession of a Hart-Carter cata-

---

1. Appellant, in its brief, also questioned the amount of the recovery awarded by the jury on Anderson's claim for commissions on certain other sales which he had consummated. At oral argument, however, counsel for appellant conceded these amounts to be inconsequential and that we need not consider them further on this appeal.

log, was not considered a Hart-Carter dealer. The record indicates that Anderson made the initial contacts with this customer and played a significant role in convincing Coffey-Reid of the superiority of the Hart-Carter product over competing grain dryers. Hi-Plains, however, had provided construction services for Coffey-Reid on an earlier occasion, and Coffey-Reid asked Hi-Plains to sell and install the Hart-Carter dryer on this occasion. Hart-Carter agreed to sell the requested item through Hi-Plains, paying Hi-Plains the usual fifteen percent commission on the transaction. District sales manager Helsdon, who knew that Anderson had made initial contacts with this customer, received his usual override commission on the sale; Anderson received nothing.

In the second sale, the Farmers Grain & Mercantile Exchange of Yuma, Colorado, contracted with Borton, Inc. of Hutchinson, Kansas, in July of 1967, for the installation of a Hart-Carter dryer. Anderson had also made several preliminary calls at Farmers Grain prior to this date in an attempt to make a sale. The Hart-Carter invoice issued upon the sale bore the notation, "E. A. Anderson $1,500.00," and a copy thereof was sent to Anderson. At trial, Hart-Carter representatives testified that this notation represented a payment or credit due to Anderson upon this sale at Yuma. The evidence fails to disclose whether Anderson ever received that payment or credit. Borton, Inc., as selling agent, received a ten percent commission on the sale rather than the usual fifteen percent.

In the third sale in question, Collingwood Grain Company of Hutchinson, Kansas, contracted for the installation of two Hart-Carter grain dryers through Biehler Sales, Inc., a dealer-contractor for grain elevator equipment also located in Hutchinson, Kansas. Biehler Sales initially attempted to sell Collingwood a dryer manufactured by a Hart-Carter competitor. Anderson had earlier made contact with Collingwood Grain Company at the request of district manager Swaim during 1966. In

1967, district manager Helsdon and Anderson tried unsuccessfully to close a sale with Collingwood. Although Collingwood expressed a preference for the Hart-Carter dryers, it chose to contract with Biehler Sales for their installation. Hart-Carter agreed to provide the two grain dryers through Biehler Sales and paid the usual fifteen percent commission on the transaction. District manager Helsdon received his usual override commission. Anderson again received nothing.

In support of his right to a commission for these three sales, Anderson advances two alternative theories. He argues that even though he did not consummate the sales, he is entitled to the commissions because: (1) his efforts in fact produced the sales; and (2) he had the exclusive right to sell to each of the three purchasers by virtue of the "protection" granted him by Hart-Carter through Swaim. Hart-Carter contends that Anderson is not entitled to the commission under either theory because he did not consummate the sales in question; it construes the term "protection" to mean that Anderson would only be protected in receiving a full commission upon consummating a sale outside of his exclusive franchise area in Nebraska.

The district court instructed, in part, that to find for the plaintiff the jury must determine from a preponderance of the evidence (a) the existence of a contract between the parties; (b) the terms of any such contract; (c) that plaintiff performed his obligation thereunder; (d) that defendant breached his obligation thereunder; and (e) that defendant's breach caused plaintiff to suffer damages. In amplification, the court said:

In determining the exact provisions and conditions of the agreement or agreements between the plaintiff and the defendant, and I use the terms "agreements" or "contracts" interchangeably, you should consider the situation of the parties, all the circumstances attending the transaction, their conduct, the discussions between

them and the statements made by them before, during and after the agreements, if any, were made. You must also consider the subject matter, interpretations placed on any agreements by the parties, and all of the facts and circumstances shown by the evidence which would throw light on the precise agreement of the parties, and determine therefrom the true relationship between the parties.

■ The jury, by its verdict, determined that Hart-Carter had contracted to pay commissions for the Yuma sale and the two sales in the State of Kansas. The introduction of the invoice on the Yuma sale, which indicated that Anderson was entitled to $1,500 credit on that transaction, serves to refute appellant's contention that Anderson could not qualify to receive any commission on sales of Hart-Carter dryers made by others outside Nebraska. Given this evidence, we believe that the trial court properly submitted to the jury the question whether the parties had entered into a contract for commissions relating to the three sales here in question.

■ The jury also determined that the contract provided for a fifteen percent commission to be paid Anderson for these sales, although none were consummated by Anderson. We can find no evidence to establish that the parties ever entered into an agreement providing for such a fifteen percent override commission to Anderson on sales consummated by others. The only evidence bearing on this subject comes from the

parties' agreement relating to Nebraska. In that state, where Anderson had an exclusive franchise to sell Hart-Carter dryers, "protection" meant that Anderson received a fifteen percent commission on sales consummated by him and a five percent override commission on sales consummated by others. The record provides no indication that Hart-Carter agreed at any time to refrain from selling its products through others, either in Nebraska or elsewhere. Consequently, when the term "protection" was used by Swaim with reference to prospects outside Nebraska, it could mean, at best, that Anderson was to receive a five percent commission on sales to those prospects, if those sales were consummated by others. No evidence supports an award of more than a five percent commission on these sales.

Accordingly, the trial court should have granted defendant post-trial relief from that part of the plaintiff's recovery which was not supported by the evidence. We remand this case for further proceedings consistent with this opinion. The trial court may grant a remittitur of the award to an appropriate amount, subject to plaintiff consenting thereto,[2] or a new trial under Rule 59, Fed.R.Civ. P. *See* Bankers Life & Casualty Co. v. Kirtley, 307 F.2d 418 (8th Cir. 1962); Rice v. Union Pacific R. Co., 82 F.Supp. 1002 (D.Neb.1949).

We have considered the other arguments presented by appellant and find them to be without merit. Neither party shall tax costs on this appeal.

2. As we have already noted, the evidence justifies an award upon the sales in question for a five percent commission to Anderson. The record is unclear, however, whether Anderson has already received

part of such commission through a payment or credit on the Yuma, Colorado, transaction. The parties should clarify this matter upon remand.