369 A.2d 1180

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Gregory BARNETT (two cases).**

Supreme Court of Pennsylvania.

Argued June 23, 1975.

Decided Feb. 28, 1977.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Gold-blatt, Asst. Dist. Atty., Chief, Appeals Div., James Garrett, Philadelphia, for appellant.

Stanley M. Shingles, Philadelphia, for appellees.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

EAGEN, Justice.

These appeals[1] were entered by the Commonwealth[2] from an order of the Court of Common Pleas of Philadelphia granting Gregory Barnett's motion to suppress certain incriminatory statements[3] given to the police. The suppression court granted Barnett's motion because it found from the evidence presented that the statements were the product of an illegal arrest which violated Barnett's fourth amendment right to be free from unreasonable seizure. We agree that the state-

1. An appeal relating to homicide charges was filed in this Court, and an appeal relating to other charges was filed in the Superior Court and certified here. See Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, No. 223, art. II, § 202, 17 P.S. § 211.202(1) and art. V, § 503, 17 P.S. § 211.503(c).

2. The Commonwealth may appeal from pre-trial rulings where the practical effect of such a ruling is to terminate the prosecution, *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304 (1963), and where it appears that a pretrial order suppressing evidence will substantially impair the prosecution of the case because the Commonwealth may not present all of its available evidence, *Commonwealth v. Taper*, 434 Pa. 71, 253 A.2d 90 (1969).

3. Barnett also filed a motion to suppress certain physical items obtained pursuant to a warrant but the suppression court did not grant or deny that motion. Accordingly, we express no view as to the propriety of evidentiary use of those items at trial.

ments were the product of an illegal arrest, and accordingly, affirm the order.[4]

The relevant facts are as follows:

Vincent Barnett and his wife, Sheryl, were found dead in their residence at 1213 N. 30th Street, Philadelphia. Their bodies were discovered by firemen responding to an alarm concerning a fire at their residence on August 15, 1974. The fire was subsequently determined to have been of an incendiary origin. Although their bodies were partially burned in the fire, the deaths were not the result of the fire. Sheryl had died from a beating and strangulation. Vincent had died as a result of two severe stab wounds of the neck and chest and had suffered numerous other stab wounds. Both bodies were tied at the hands and Vincent's was bound at the feet.

Detective Gilbert of the Philadelphia Police Department was assigned to investigate the killings on the day of the fire. On August 16, 1974, Gilbert met for the first time with Gregory Barnett, Vincent's brother, at his mother's residence next door to the scene of the fire. Gilbert inquired about Vincent's background, but did not pursue the inquiry because Gregory was apparently upset over Vincent's death. Gilbert did not meet with Gregory again until August 29, 1974.

Between August 16 and August 29, the police received an anonymous phone call. The caller suggested Gregory Barnett knew about or was involved in the deaths. Acting on this information alone, Gilbert and other officers went to Barnett's residence at approximately 6:55 a. m. on August 29, 1974. After being voluntarily admitted by Barnett, the police asked Barnett to accompany them to the Police Administration Building for questioning. Barnett asked if the police had a "search" warrant, and, upon being informed that they did not, he refused to ac-

4. Because of our determination with regard to the illegal arrest, we need not reach Barnett's alternative theories under which he seeks to have the suppression court's order affirmed.

company them. Barnett was placed under arrest, although he was permitted to dress before being handcuffed. He was transported in a police wagon to the Administration Building.

Barnett's wife, Gloria, asked permission to also go to the Administration Building. The police granted her request. She attempted to find someone to sit with her two minor children, but was unsuccessful. As a result, Gloria and the two minor children were taken to the Administration Building in a squad car.

Barnett arrived at the Administration Building at 7:15 a. m. and was left alone in an interrogation room from 7:18 a. m. until 7:40 a. m. At 7:40 a. m., Gilbert gave Barnett *Miranda* warnings. Barnett then indicated he did not wish to remain silent and did not desire the presence of a lawyer. Barnett was then questioned. He denied any complicity in the killings, any knowledge of who committed the killings and indicated a willingness to submit to a lie detector test.

At 8:15 a. m., Barnett was taken to a polygraph room where he executed a polygraph examination agreement indicating he voluntarily and willingly submitted to a lie detector examination. From 8:15 a. m. until 11:15 a. m., Barnett was with the polygraph examiner except for a five minute period when he was alone. The polygraph examination took about twenty minutes to administer.

At 11:15 a. m., Barnett inquired about food; a meal was ordered for him. From 11:17 a. m. until 11:50 a. m., Barnett was in the presence of Gilbert and another police officer. At that time, Barnett was again given *Miranda* warnings and conversed about his general background. From 11:50 a. m. until 12:10 p. m., Barnett ate his meal.

Gloria Barnett was interviewed and given a polygraph test upon her arrival at the Administration Building. Gloria also signed a polygraph examination agreement indicating a willing and voluntary submission to the ex-

amination. At approximately 12:05 p. m., Gloria was re-interviewed and told Detective Hoff that on the day after August 15, 1974, Barnett came home wearing his brother's clothing and two of his brother's rings, and smelled of smoke. Gloria had previously been told, following an inquiry by her, that she could not be compelled to testify against her husband and that she would not get in any trouble for telling the truth.

At 12:10 p. m., Barnett was told by the police what his wife had said, *that he had failed the polygraph examination,* and that they did not believe what he had said at the 7:40 a. m. interview. Barnett then began weeping uncontrollably and admitted he had killed his brother. He then asked to see his wife and was allowed to do so from 12:37 p. m. until 12:58 p. m.

Barnett was then taken to the bathroom and allowed to rest until 1:31 p. m. He was then interviewed again and amplified his admission to include an accomplice.

The statements given at 7:40 a. m., 12:10 p. m., and 1:30 p. m. were all reduced to writing and signed by Barnett. These statements were ordered suppressed.

The Commonwealth concedes that the arrest of Barnett was illegal, but maintains the incriminatory statements were not the product of the illegal arrest because they were motivated by intervening events, namely, Barnett having been confronted with the information obtained from his wife [5] and his remorse.

5. We shall assume for purposes of the disposition of these appeals that the presence of Barnett's wife at the Administration Building, the questioning of her, and the information obtained from her were not tainted by the illegal arrest of Barnett. She testified that she did not request permission to accompany her husband, but the court credited other testimony which established she voluntarily requested to accompany him. Because the court credited the other testimony, a difficult issue, that is, whether the marital relationship in itself would be sufficient reason to consider the accompanying of her husband as tainted by the arrest, would otherwise be presented. But, since disposition of these ap-

■ It is well-established that the Commonwealth has the burden of showing the absence of a causal nexus between an illegal arrest and a statement, *Commonwealth v. Wright*, 460 Pa. 247, 332 A.2d 809 (1975); *Commonwealth v. Bishop*, 425 Pa. 175, 228 A.2d 661 (1967), and may do so by showing intervening circumstances and events motivated the statement, *Commonwealth v. Fogan*, 449 Pa. 552, 296 A.2d 755 (1972). When Barnett first incriminated himself, he was indeed confronted with information obtained from an untainted source, namely, the information obtained from his wife, supra n. 5, and if this was all that Barnett had been confronted with at the time, then the Commonwealth might well have sustained its burden. See and compare, *Commonwealth v. Fogan*, supra, and *Commonwealth v. Marabel*, 445 Pa. 435, 283 A.2d 285 (1971). Furthermore, the remorse expressed by Barnett supports the Commonwealth's position. See, e. g., *Commonwealth v. Davis*, 462 Pa. 27, 336 A.2d 888 (1975). But, when confronted with the information obtained from his wife, Barnett was also confronted with the fact that he failed the polygraph examination; this fact is dispositive. Compare *Commonwealth v. Marabel*, supra.

[■■ First, the result of the test must be considered tainted by the illegal arrest because just as a statement obtained after *Miranda* warnings and an indication by an accused that he does not wish to remain silent and does not desire to consult with a lawyer may not standing alone purge a statement of the taint from the illegal arrest, *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the mere indication of a willingness to submit to a polygraph examination does not purge the result of the examination from the taint of the illegal arrest.

peals can be made without confronting that difficult issue, we express no view as to its resolution but merely assume, as the Commonwealth advocates, that the information obtained from Barnett's wife was not tainted by his illegal arrest.

■  Barnett was confronted with the tainted result of the examination immediately prior to incriminating himself and we cannot say, as a matter of law, that the statement was the product of remorse and the information obtained from Barnett's wife, rather than the product of the result of the polygraph examination.

We indicated strongly in *Commonwealth v. Marabel,* supra, that a very important factor in that case, where the incriminatory statement was held to have been properly introduced into evidence, was that "[n]othing that was learned during the prior interrogations was employed against appellant to force him to confess." *Commonwealth v. Marabel,* supra, 445 Pa. at 447, 283 A.2d at 291.  Instantly, the result of the polygraph examination, which was tainted, was used to influcence Barnett's confession.

Second, the "purpose and flagrancy of the official misconduct" are very important factors in cases such as this.  *Brown v. Illinois,* supra at 604, 95 S.Ct. at 2262. Here Barnett was arrested in the early morning hours without any apparent justification or attempt to obtain a warrant.  Additionally, he asked if the police had a warrant and refused to accompany the police when he learned they did not; yet, the police totally disregarded this proper exercise by Barnett of his constitutional right.  We must therefore conclude, as did the Supreme Court of the United States in *Brown v. Illinois,* supra at 605, 95 S.Ct. at 2262, "The manner in which [he was arrested] gives the appearance of having been calculated to cause surprise, fright and confusion."

Third, the "temporal proximity of the arrest and the confession," here the first incriminatory statement, *Brown v. Illinois,* supra at 603, 95 S.Ct. at 2261–62, cf. *Johnson v. Louisiana,* 406 U.S. 356, 365, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), was only five hours, and this factor also indicates the statements were the product of the

42

illegal arrest. See, *Commonwealth v. Wright,* supra; *Commonwealth v. Daniels,* 445 Pa. 552, 317 A.2d 237 (1974); *Commonwealth v. Fogan,* supra.

Accordingly, the order is affirmed.

POMEROY, J., concurs in the result.