William **BENNETT**

v.

**The STATE of Texas.**

**No. 07–82–0256–CR.**

Court of Appeals of Texas, Amarillo.

Dec. 31, 1984.

E. Dean Roper, Jeff Blackburn, Amarillo, for appellant.

Danny E. Hill, Dist. Atty., Amarillo, for appellee.

Before REYNOLDS, C.J., and DODSON and COUNTISS, JJ.

COUNTISS, Justice.

Appellant was convicted of murdering Phillis Fassauer and sentenced to 75 years in the penitentiary. In this Court he contends, by four grounds of error, that the confession used against him was inadmissible. We affirm.

On November 17, 1981, a friend found the bodies of Robert Phillips and Phillis Fassauer in Phillips' home. Both had been shot to death. Two days later, appellant's sister told police he had admitted killing them. Acting on her information, police prepared an "Affidavit for Search and Arrest Warrant." The document failed to request an arrest warrant, however, and police were issued only a search warrant for appellant's car. Officers then went to the residence of an individual named Jim Shelnutt to execute the warrant. Several officers began to search appellant's car, which they found parked outside Shelnutt's residence, while another officer went to the house and attempted to rouse the occupants. After no one responded to his knocks and yells, the officer kicked in the door. Espying appellant sitting on a couch and smoking a marijuana cigarette, the officer arrested him for murder. A few hours later, at 4:30 a.m. on November 20, 1981, after receiving appropriate admonitions and after observing that his sister was cooperating with police, appellant gave a statement admitting that he shot Phillips and Fassauer, implicating no one else and suggesting some elements of self-defense as to Phillips. Appellant was subsequently arraigned and counsel was appointed to represent him.

A week later, appellant told a jailer he wanted to talk to the officers who had taken his confession. The jailer relayed the request, but the officers did not respond. Appellant repeated the request the next day and the two officers then met with him. At that time, appellant said he wanted to tell them about Jim Shelnutt's involvement in the murder. The officers read Bennett his rights again and, according to one of the officers, "We discussed the fact that he had a lawyer and could have him over there. And he indicated that he didn't want his lawyer there."

Appellant then made a second statement, more detailed than the first, admitting the murders and revealing that Shelnutt hired him to kill Phillips for $1,000 worth of "crystal." [1]

At the trial, the State introduced only the second statement, which the trial court found was given, after appropriate warnings, freely and voluntarily and "was not tainted by any arrest of ... [appellant] prior to the giving of the statement." In this Court, appellant launches a dual attack on the statement. First, by grounds one and two, he argues that its admission violated the Fourth Amendment of the U.S. Constitution and Art. 1, § 9 of the Texas Constitution because appellant's warrantless arrest was illegal, the first statement was fatally tainted by the illegal arrest and the first statement fatally tainted the second. Next, by grounds three and four, he argues that the taking of a second statement after appellant was represented by counsel violated his rights under the Sixth Amendment of the U.S. Constitution and Art. 1, § 10 of the Texas Constitution. We will resolve the arguments in the order stated.

In determining whether the second statement was fatally tainted by the events preceding it, as asserted by grounds one and two, we will assume, without deciding, that the warrantless entry into the house where appellant was arrested was illegal and the first confession inadmissible. [2]

---

1. The second statement is set out in full as "Appendix A" of this opinion.

2. We reserve the right to resolve those matters, should it later become necessary to do so, without any assumptions of impropriety. We have serious doubts about appellant's standing to challenge the warrantless entry at the time of this arrest. See United States v. Torres, 705 F.2d 1287, 1296 (11th Cir.1983); United States v. Renton, 700 F.2d 154, 161 (5th Cir.1983); Lewis v. State, 598 S.W.2d 280, 283–84 (Tex.Crim.App. 1980); Willeford v. State, 454 S.W.2d 745, 746 (Tex.Crim.App.1970); Gaskin v. State, 365 S.W.2d 185, 186 (Tex.Crim.App.1963). See gen-

Also, we will resolve both constitutional challenges under one analysis, because appellant's protections under Art. 1, § 9 are the same as his Fourth Amendment protections. *Brown v. State,* 657 S.W.2d 797, 798–99 (Tex.Crim.App.1983).

The controlling question, then, is whether the statement admitted into evidence was a product of appellant's arrest and first statement, or of legal means sufficiently separate from the arrest "to be purged of the primary taint." *Duncan v. State,* 639 S.W.2d 314, 317 (Tex.Crim.App. 1982).

■ In this problem area, each case is to be resolved on its own facts. *Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975). The threshold question is whether the confession was voluntary under *Miranda. Brown,* 422 U.S. at 604, 95 S.Ct. at 2262. Other significant factors are " '[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct.' " *Taylor v. Alabama,* 457 U.S. 687, 690, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982), *quoting Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62.

A case factually comparable to this one is *Wicker v. State,* 667 S.W.2d 137 (Tex. Crim.App.1984). In that case, the arrest was illegal because the arrest warrant was not based on probable cause. During the defendant's detention, he gave certain written and oral statements at the outset that were not used at trial. In the interum he was given repeated *Miranda* warnings, was taken before a magistrate, and was not subjected to improper influence from the police. The written confession used at

trial came five days after the illegal arrest. Between the giving of the statements not used and the one admitted into evidence, the defendant was allowed to meet with lawyers, his family, and a psychiatrist. Probable cause was developed after the arrest but before the last written statement. The Court of Criminal Appeals held that the last written statement "was not the result of exploitation of the arrest and prior statements. We find no causal relationship between the prior statements and the written statement admitted at trial." *Id.* at 141.

■ In this case, ten days separated the arrest from the second confession. Appellant was given thorough *Miranda* warnings several times, was taken before a magistrate, and was not subjected to improper influence from the police. From the statement, we know he consulted his lawyer several days before he gave the statement. From the record we are satisfied that the immediate cause of appellant's first confession was his confrontation with his sister and the realization that she would probably testify for the State.[3] Finally, the State had probable cause to arrest Bennett at the time it obtained the search warrant, so that the warrantless entry, while disconcerting and generally intolerable, was not done to illegally circumvent arrest requirements. Thus, after careful consideration of all the surrounding circumstances, we conclude, consistent with *Wicker, supra,* that the second statement was not fatally tainted. Grounds one and two are overruled.

Having found that the second statement was not tainted, by appellant's arrest and first statement, we must next determine

---

*erally* 3 LA FAVE, SEARCH & SEIZURE § 11.3 at 554–55 (1978).

**3.** Unlike the defendant in *Pitts v. State,* 614 S.W.2d 142, 143 (Tex.Crim.App.1981), appellant was not confronted with tainted evidence. If an impetus for confession exists, untainted by and separate from the illegal arrest, then it should be given some consideration when deciding whether the confession was a fruit of the arrest. *Brewer v. State,* 271 Ark. 810, 611 S.W.2d 179, 182 (1981); *People v. Gabbard,* 78 Ill.2d 88, 34

Ill.Dec. 751, 398 N.E.2d 574, 579 (1979); *Commonwealth v. Barnett,* 471 Pa. 34, 369 A.2d 1180, 1183–84 (1977). The question is not whether the intervening events are the sole cause of the confession, but whether the confession " 'was *sufficiently* an act of free will to purge the primary taint.' " *Brown v. Illinois,* 422 U.S. at 599, 95 S.Ct. at 2259 (emphasis added in *Brown* ), *quoting Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963).

whether it was obtained in violation of his state and federal rights to counsel, as he contends in his third and fourth grounds. Here, also, we apply a single analysis to both grounds. *See Parker v. State,* 545 S.W.2d 151, 155 (Tex.Crim.App.1977).

■■■ The filing of formal charges activates the Sixth Amendment right to counsel, *Rudd v. State,* 616 S.W.2d 623, 624 (Tex.Crim.App.1981), and forbids the State from eliciting incriminating statements from a defendant in the absence of his counsel. *Brewer v. Williams,* 430 U.S. 387, 400, 97 S.Ct. 1232, 1240 (1977). The right to counsel may be waived, however, and the standard for showing a waiver of the Sixth Amendment right to counsel is the same as that for the Fifth Amendment, once counsel has been requested: the waiver must be voluntary, knowing and intelligent. *Green v. State,* 667 S.W.2d 528, 532 (Tex.Crim.App.1984). The burden is on the State to show such a relinquishment of rights, and courts should indulge every reasonable presumption against such a waiver. *Parker v. State,* 545 S.W.2d 151, 155 (Tex. Crim.App.1977). Courts must test the waiver in light of the totality of the circumstances. *Castro v. State,* 562 S.W.2d 252, 258 (Tex.Crim.App.1978).

Here, appellant had his rights read to him several times before each statement was given and expressly waived his right to counsel, in writing, in the second statement. *See Williams v. State,* 566 S.W.2d 919, 923 (Tex.Crim.App.1978). There was also evidence that he expressly waived his right to counsel orally before the statement was prepared. Appellant's oral and written statements are strong evidence of the validity of the waiver. *Kelly v. State,* 621 S.W.2d 176, 180 (Tex.Crim.App.1981).

■■ · Additionally, we note that appellant was twenty-five years old, had at least some high school education, and was able to read. Although he presented evidence of emotional and possibly neurological problems, nothing in the record indicates he lacked the capacity to waive his rights. Most significantly, it was appellant who made two separate requests for the interview that led to the second confession. *Phifer v. State,* 651 S.W.2d 774, 778 (Tex. Crim.App.1983); *Kelly,* 621 S.W.2d at 180. Thus, from the totality of the circumstances, the trial court did not err in finding that appellant waived his right to counsel "knowingly" and "of his free will, and that he was not denied the assistance of counsel."

The judgment of conviction is affirmed.

## APPENDIX A
### STATEMENT

Statement of __William Randall Bennett__ , taken on the __30th__ day of

__November__ 19_81_ at __1:30__ o'clock __P__ M.   I

__William Randall Bennett__ was warned at __500 S. Fillmore__
                                                  Address

Amarillo, Potter County, Texas, by __Investigator Walt Yerger__

the person to whom I am making this statement prior to any questioning of me by a peace officer while under arrest:  (1) that I have the right to have a lawyer present to advise me either prior to any questioning or during any questioning; (2) that if I am unable to employ a lawyer I have the right to have a lawyer appointed to counsel with me prior to or during any questioning; and (3) that I have a right to remain silent and not make any statement at all and that any statement I make may be used in evidence against me at my trial, and (4) I have the right to terminate the interview at any time.

Prior to and during the making of the statement, I have and do hereby knowingly, intelligently, and voluntarily waive the above explained rights and I do make the following voluntary statement to the aforementioned person of my own free will and without any promises or offers of leniency or favors, and without compulsion or persuasion by any person or persons whomsoever: On 11/30/81, I told a Deputy Thomas Of the Potter Count Sheriffs Office that I wanted to talk to Investigator Yerger.  I saw my lawyer about 11/24/81, while at the Potter County Sheriffs Office.  I wanted to tell Yerger the following facts because I was not the only one involved and I don't want to be the only one punished when someone else helped me.  On 11/16/81, at about 5:00p.m., while at James Shelnutt's house at 4024 Hilltop Avenue, in Amarillo Texas, I was talking with Jim Shelnutt.  Jim came out and asked me if I would kill Robert Phillips and I kind of freaked out and told him "Man I Ain't never snuffed nobody".  Jim said "I'll pay you but you'll have to wait for it because the guy with the crystal is out of town and I'll give you a half an ounce of crystal which cost a thousand dollars, if you want some time to think about it that's ok if you just don't want to jump off into it.  I sat there for a while and then said ok I'll go ahead and do it.  The gun was already at the house, Jim gave me a shot of crystal and then we sat around and waited.  About 9:00 or so Jim drove me over to Robert's house on W. Central and we drove around the block a couple of times and then Jim dropped me off about a half block east of the house and I walked up there.  I walked in the sliding glass door that was open.  Robert asked me if I had gotten the diamonds I was suppose to steal and split with him.  I told him I didn't do it the people weren't at home.  Robert didn't believe me so I went to the kitchen to get a drink of water Phyllis was in the living room with Robert.  I came back into the living room and started shooting.  Robert and Phyllis were on the loor together.  I shot Robert first.  I shot Robert one time.  I then shot at Phyllis five more times Phyllis didn't have much time and ducked forward as I shot her.  I ran out the door and hid in the shrubs outside to make sure no lights came on.  I started walking down Central East.  I walked 5 or 6 blocks.  Shelnutt picked me up in the car.  He asked me if it was done, and I said "yea" get me the fuck away from here.  Jim said "Are you sure and I said "yea".  We went back to his house and watched the rest of the football game and went to bed.  We drove around for awhile before we went back to his house.  I threw the shells out on the Dumas E-way before we got back.  I laid the gun, a ruger brand stainless.357 mag with a 4" barrel down in Jim's living room.  The gun belonged to Jim Shelnut We never talked about it again, I got arrested for this shooting before Jim paid me.  I have read the above statement and it is true and correct to the best of my knowledge. XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXNO STATEMENT BELOW THIS LINEXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

Signed this __30th__ day of __November__ , 19_81_ at __2 30 P__ o'clock

___ M, at __500 S. FILLMORE__ .

__W. R. Bennett__
Defendant

__W. C. Hunsun #615__
Witness

__Jimmy D. Boydston #805__
Witness

STATE'S EXHIBIT

Pre-trial
535