Ronald **FISHER**

v.

**Palmer C. SCAFATI, Superintendent, Massachusetts Correctional Institution, Walpole.**

**Misc. Civ. No. 69–2–G.**

United States District Court, D. Massachusetts.

Dec. 30, 1969.

Memorandum and Order Following Evidentiary Hearing July 13, 1970.

930

Richard J. Rubin, Gainsburg, Gottlieb, Levitan & Cole, New York City, for petitioner.

David G. Nagle, Deputy Asst. Atty. Gen., Boston, Mass., Lawrence Cohen, Asst. Atty. Gen., Matthew J. Ryan, Jr., Dist. Atty., Western Dist., Springfield, Mass., for defendant.

## MEMORANDUM AND ORDER

GARRITY, District Judge.

Petitioner is seeking issuance of a writ of habeas corpus. He is presently in the custody of respondent pursuant to a stayed sentence of death upon conviction for murder in the first degree in the Massachusetts Superior Court for Hampden County after a trial which began on September 26, 1966. By a previous order the court limited consideration of the petition to petitioner's claim that the denial of his motion to suppress and admission into evidence of his confession was in contravention of the decision of the United States Supreme Court in Miranda v. Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. This contention of petitioner was fully considered by the Massachusetts Supreme

Judicial Court, Commonwealth v. Fisher, 1968, 354 Mass. 549, 238 N.E.2d 525.

At the hearing on the petition, petitioner introduced into evidence the record transcript of the trial on the threshold issue whether in so doing petitioner has overcome the presumption of correctness of the findings of fact made by the trial judge in his order allowing the contents of the confession into evidence. 28 U.S.C. § 2254(d).

The trial court's entire findings with respect to the Miranda issues, after conducting a voir dire, were "that at the time when the suspicion of crime was focused upon defendant, he was advised by the police that he had a right to remain silent, need not answer questions. He had a right to counsel and the services of counsel. And, Lieutenant Shea told him that if he couldn't afford one, that he would be furnished one."

The petition in this court alleges (a) that the warnings required by Miranda were not given timely; (b) that he was not clearly informed that he could have counsel with him while being interrogated and that, if he could not afford counsel, one would be provided for him at State expense; and (c) that he did not understandingly waive his right to retained or appointed counsel during questioning. The same points were raised and preserved at the trial and on appeal.

Under Miranda v. Arizona, supra, certain specific rights under the Fifth and Fourteenth Amendments arise "when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way." Before police officers may question him "about matters that might tend to incriminate him [he] is entitled to be warned 'that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' 384 U.S. at 479, 86 S.Ct., at

1630." Mathis v. United States, 1968, 391 U.S. 1, 3–4, 88 S.Ct. 1503, 1504, 20 L.Ed.2d 381. The Supreme Court's opinion in the *Miranda* case "iterated and reiterated the absolute necessity for officers interrogating people 'in custody' to give the described warnings." Orozco v. Texas, 1969, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311.

The voir dire testimony before the trial judge concerned police interrogation of the petitioner which commenced on the morning of July 11, 1966 and ended with his signing a written confession about 17 hours later at 4:00 A.M. on July 12. He was given various warnings concerning his constitutional rights on the morning of July 11 shortly after the questioning was begun and again on the evening of the same day after a trip to Boston, where he voluntarily submitted to a polygraph examination. Lieutenant Shea, the officer mentioned in the judge's findings, testified that after the petitioner had become a suspect he would not have been permitted to leave the police station to which he had come voluntarily at the request of the police. Two days previously, on July 9, he had been questioned at police headquarters as one of several persons who had been at a party attended by the victim on the evening of the murder. At that time the petitioner denied any knowledge of the crime. Before the interrogation of the petitioner resumed on the morning of July 11, the police discovered an inconsistency between what the petitioner had told them on July 9 and the statement of another person who had been interviewed. It had to do with the petitioner's having borrowed an automobile and left the party alone for approximately an hour.

■ On the issue of the timeliness of the warnings given the petitioner, the trial judge found that they were given "at the time when the suspicion of crime was focused upon defendant." Obviously the trial judge was employing the standard formulated in Escobedo v. Illinois, 1964, 378 U.S. 478, 492, 84 S.Ct. 1758, 12 L.Ed.2d 977, which determines when the right to counsel arises under the Sixth and Fourteenth Amendments. This was erroneous. In determining the time when warnings required by the Fifth and Fourteenth Amendments must be given, the *Escobedo* case has been superseded by the *Miranda* case. See Pallotta v. United States, 1 Cir. 1968, 404 F.2d 1035, 1038. The critical time under *Miranda* is "when the individual is first subjected to police interrogation while in custody at the station." It may be, as noted in the opinion of the Supreme Judicial Court at 1031, that there is no conflict between the *Miranda* and *Escobedo* standards as applied to the case at bar and that Lieutenant Shea's interrogation of the defendant became an in-custody interrogation at the point when Shea observed the scratches and the investigation "focused" on the defendant. But whether the trial judge took the same view, i.e., that the critical times under *Miranda* and *Escobedo* coincided, is not stated in his findings and is unclear from the entire record on the voir dire. Cf. Leventhal v. Gavin, 1 Cir. 1968, 396 F.2d 441. The testimony before him on the voir dire dealt as much with warnings given in the evening after the return from Boston as with those given in the morning. The theory of admissibility urged by the prosecution in oral argument upon conclusion of the voir dire was based upon the warnings given in the evening. In employing the *Escobedo* test, the judge may have considered that the process shifted from investigatory to accusatory and the focus was on the petitioner after he had taken the lie detector test in Boston. Thus it may be that the trial judge's findings with respect to the adequacy of the warnings pertained to those given in the evening and that he made no findings whatever with respect to the adequacy of those given in the morning.

■ Regarding the content of the warnings given in the morning, the three officers who interrogated the petitioner at Springfield Police Headquarters testified at the voir dire that Lieutenant Shea, soon after observing

scratches on the petitioner's neck, told the petitioner "that he was entitled to be represented at all times by counsel. * * * that he could remain silent, and that if he said anything it could be used against him, * * * " When testifying about the warnings given in the evening Lieutenant Shea stated, "At this time I informed him again of his right to an attorney, the fact that if he couldn't afford one, that he would be furnished with one; his right to remain silent; and the fact that anything he said would be used against him." Assuming that the trial judge's findings pertained to the morning warnings, was his finding that Lieutenant Shea told the petitioner that if he couldn't afford an attorney, that he would be furnished one, fairly supported by the record before him? Each of the three police witnesses at the voir dire testified as to what warnings were given in the morning and none of them mentioned the required warning that, if the petitioner could not afford counsel, counsel would be provided for him at State expense. All of them testified explicitly that the threefold warning described by Lieutenant Shea was all that had been given to the petitioner in the morning. The use of the word "again" in the evening warning by Lieutenant Shea does no more than raise a doubt as to the otherwise clear testimony of what was told to the petitioner that morning.

▪ Moreover, it does not appear from the record of the voir dire hearing that at the commencement of the incriminating interrogation petitioner was "clearly informed that he [had] the right to consult with a lawyer and to have the lawyer with him during interrogation." Miranda v. Arizona, *supra,* 384 U.S. at 471, 86 S.Ct. at 1626. Lieutenant Shea did tell the petitioner that he was entitled to be represented at all times by counsel. But representation by counsel does not necessarily connote the presence of counsel at the client's side. The same may be said of Lieutenant Shea's evening warning in which the word "again" was used in connection

with telling the petitioner of "his right to an attorney."

It has not been disputed in this court that the police were required to give the Miranda warnings to the petitioner no later than the time when Lieutenant Shea first told him that he was entitled to be represented at all times by counsel. Petitioner, of course, is contending that the warnings should have been given at the beginning of the interrogation at police headquarters on the morning of July 11.

▪ The court concludes that the petitioner has established on the basis of the record of the proceedings in the state court (a) that the merits of the factual dispute regarding the timeliness of the Miranda warnings were not resolved in the State court hearing, 28 U. S.C. § 2254(d) (1); and (b) that, on consideration of the record of the voir dire as a whole, the factual determinations by the trial judge that the petitioner was told that he had a right to the presence of an attorney and that if he couldn't afford one that he would be furnished one, are not fairly supported by the record, 28 U.S.C. § 2254(d) (8). Therefore the presumption of correctness of the state court findings has been overcome by the petitioner.

In his memorandum of law filed after the hearing on the petition, the Attorney General requested that the matter be set down for an evidentiary hearing if the court should conclude that the state court record does not fairly support its findings. Cf. Brown v. Heyd, E.D. La. 1967, 277 F.Supp. 899, aff'd sub nom. Heyd v. Brown, 5 Cir. 1969, 406 F.2d 346, cert. den. 396 U.S. 818, 90 S.Ct. 53, 24 L.Ed.2d 69. The respondent is entitled to such a hearing. Townsend v. Sain, 1963, 372 U.S. 293, 322, 83 S.Ct. 745, 9 L.Ed.2d 770. The court will receive evidence on the following issues: (1) was the interrogation of the petitioner on July 11, 1966 custodial in natural from its inception and, if not, when did it become custodial in nature thereby requiring Miranda warnings? (2)

was petitioner apprised of his constitutional rights? and (3) if he was so informed, was there a waiver of those rights? See Pallotta v. United States, *supra*, 404 F.2d at 1038.

## MEMORANDUM AND ORDER FOLLOWING EVIDENTIARY HEARING

The evidentiary hearing has been held and the sole witness called by respondent was Lieutenant (now Captain) Shea of the Springfield Police Department.[1] Petitioner called no witnesses of his own but made the entire trial transcript, including the transcript of the voir dire hearing, part of the record. The parties made oral arguments and filed memoranda of law.

On the first issue, whether the interrogation of petitioner on July 11, 1966 was custodial from its inception, the court expands its findings of fact beyond those stated in its memorandum and order dated December 30, 1969 as follows: Petitioner went to the Springfield Police Headquarters on Monday, July 11, at the request of the police. The victim's decomposed body had been discovered on July 7 and an autopsy performed that night indicated that she had been slain. The police knew that she had attended a party on July 1 and had arrested as material witnesses and were holding Dwight Walker, the occupant of the apartment where the party had taken place, and Winfred Phillips, a boyfriend of the deceased. On Friday, July 9, petitioner had been interviewed briefly by Lieut. Shea at police headquarters, stating that he had attended the party and had been drinking and had seen the deceased at the party; had remained at the party until about midnight when he left with Bragis Sullivan and his cousin, Jack Fisher; and did not see the deceased leave the party and had no knowledge regarding the crime.

On the morning of July 11, after petitioner arrived at the station but before his interrogation began, Lieut. Shea learned of a significant discrepancy between the information given by the petitioner on July 9 and a statement received from another witness. Petitioner had said that he remained at the party until leaving with Bragis Sullivan and Jack Fisher. The other witness said that, while the party was in progress, petitioner obtained the keys to Dwight Walker's automobile and left alone and returned about an hour later.

Lieut. Shea began questioning petitioner shortly before 11:00 A.M. Officers Doyle and Tisdel remained present and participated in the questioning from time to time. No one else was present. The interrogation was conducted in an office which had windows. No warnings of any sort were given to the petitioner before Lieut. Shea started the questioning.

The lieutenant first asked petitioner if he was at the party and saw the victim and petitioner replied affirmatively, stating that he had known her from before. Shea showed him a newspaper photograph of the victim and petitioner identified it, stating that he knew her as Winfred Phillips's girlfriend. Shea asked if petitioner was present when a collection was taken up in order to purchase more liquor and beer and petitioner said that he was. Shea asked if he was present when Dwight Walker returned with the liquor and petitioner replied affirmatively. Shea asked, "Isn't it true that you took his car keys and you asked him for his car keys at that time or shortly after he came back and went out alone?" Petitioner said, "No that isn't so." Shea stated, "We have information that you did."

At this time Shea noticed what appeared to be fingernail scratches on petitioner's neck and asked, "What are

---

1. Two other witnesses, police officers Doyle and Tisdel who were present during petitioner's interrogations at police headquarters, were also sworn at the outset of the hearing and sequestered; but were not called to the stand by either party. Thus their testimony given at the voir dire in the state court stands unmodified.

those scratches on your neck, Ronald?" Petitioner said they were fingernail scratches. Shea asked when he got them and petitioner said, "On the night of the party, July 1." Shea asked who did this to him and petitioner named a former girlfriend, Ruth Davis. Shea asked if petitioner had any more scratches on him and requested that he remove his shirt. When petitioner did so Shea observed what looked like three more fingernail scratches on petitioner's back. Shea then stopped the interrogation and told petitioner he was a suspect in the case and informed him of certain constitutional rights.

The foregoing facts are found by the court on the basis of Lieut. Shea's testimony given at the voir dire in the state court on September 27, 1966, about ten weeks after the date in question. At that hearing Shea also testified that petitioner had been a suspect since 10 or 11 o'clock that morning and, as a suspect, he would not have been allowed to leave had he wished to. At the hearing in this court Shea testified that petitioner became a suspect in his mind at the same time he told petitioner that he was a suspect and gave him the constitutional warnings, that is, after noticing the fingernail scratches on petitioner's neck. Shea further testified in this court that petitioner was free to leave until after he noticed the fingernail scratches. However, he said nothing to the petitioner to the effect that he was free to go or that he need not answer the questions. On the other hand, petitioner made no attempt to leave. In both courts Shea testified that until he noticed the fingernail scratches, his interrogation of petitioner was investigatory and not accusatory.

██ The court holds that the police should have given petitioner the constitutional warnings required by Miranda v. Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, before putting any questions to him at 11:00 A.M. on July 11. The safeguards commanded by the Miranda decision come into play "when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way." (348 U.S. at 477, 86 S.Ct. at 1629). The "salient features" of the four cases decided in Miranda were "incommunicado interrogation of individuals in police-dominated atmosphere" (348 U.S. at 445, 86 S.Ct. at 1612). See opinion, White, J. dissenting, in Orozco v. Texas, 1969, 394 U.S. 324, 328, 89 S. Ct. 1095, 22 L.Ed.2d 311.

Contrary to the Commonwealth's contention, Shea's questioning of the petitioner was in no sense part of a routine investigation. Cf. United States v. Gibson, 4 Cir., 1968, 392 F.2d 373. The purpose of questioning petitioner was not to determine whether or not a murder had been committed, cf. Michaud v. Robbins, 1 Cir., 1970, 424 F.2d 971, or to ascertain background facts regarding the victim or the party at which she was last seen alive. Several police officers had been investigating the crime for four days. Two of the five men who had attended the party had already been arrested as material witnesses. A third, Bragis Sullivan, had also been summoned to police headquarters and, while petitioner was being questioned, was in another room. Most important, the police knew before beginning the interrogation that at an interview two days previously petitioner had said something inconsistent with information just received from another witness about his having left the party alone for approximately one hour. It cannot be doubted that, had petitioner not been at the station when the inconsistency between his previous statement and that of another witness developed, the police would have picked him up promptly for further questioning.

The plain purpose of the interrogation of petitioner on the morning of July 11 was to determine his involvement in the murder and to elicit admissions from him. And, before any warnings were given, Shea was successful, at least to the extent of eliciting from petitioner a denial that he had borrowed Walker's

car and left alone which was inconsistent with the statement of another person at the party (whom the record does not identify). Petitioner was alone, confronted by three policemen, in a room at police headquarters. The fact that the room had windows in it is of little significance.

■■ The court's holding is not that questioning of a witness becomes "custodial interrogation" within the meaning of the *Miranda* case simply because it occurs at a police establishment. See Hicks v. United States, 1967, 127 U.S. App.D.C. 209, 382 F.2d 158, 162. All the circumstances must be taken into account. The test does not hinge on "the inner intentions of the police", United States v. Hall, 2 Cir., 1969, 421 F.2d 540, 544. See also Freije v. United States, 1 Cir., 1969, 408 F.2d 100, 103. As explained in the *Hall* case, 421 F.2d at 544:

"The [Supreme] Court could scarcely have intended the issue whether the person being interrogated had 'been taken into custody or otherwise deprived of his liberty in any significant way' to be decided by swearing contests in which officers would regularly maintain their lack of intention to assert power over a suspect save when the circumstances would make such a claim absurd, and defendants would assert with equal regularity that they considered themselves to be significantly deprived of their liberty the

minute officers began to inquire of them."

The court finds that the petitioner had become a suspect before Lieut. Shea started questioning him on July 11 and would not have been permitted to leave the police station had he requested. The court concludes that the police violated petitioner's rights under the Fifth Amendment to the Constitution of the United States by failing to explain to him his rights to silence and to the presence of an attorney before questioning him on July 11.[2]

The second issue framed in the court's previous order was whether petitioner was apprised of his constitutional rights, referring to the warnings which were given to him by Lieut. Shea shortly after Shea noticed the scratches on his neck. The Commonwealth has conceded all along that the petitioner was entitled to be given the *Miranda* warnings no later than at the time when Shea first told him about his constitutional rights. The factual issue is, what did Shea tell him at that time? The testimony in the state court has been analyzed thoroughly in the opinions of the Massachusetts Supreme Judicial Court in Commonwealth v. Fisher, 1968, 354 Mass. 549, 238 N.E.2d 525, and in this court's prior memorandum and order. This court has again read all of the testimony in the state court relating to this issue.[3] It was supplemented at the evidentiary hearing in this court by an incredible performance by Lieut. Shea,

2. The pre-*Miranda* rights of a person appearing voluntarily at a police station at the request of the police are analyzed in the Model Code of Pre-Arraignment Procedures, Tentative Draft No. 1, Mar. 1, 1966, of the American Law Institute, esp. §§ 2.01(2), 3.05(2) and 5.10 and in the appended commentary. Briefly, the code treats such a person as if he had been arrested unless the authorities tell him that he is under no obligation to remain.

3. It has not heretofore been noted that petitioner testified repeatedly in the state court that Lieut. Shea advised him, first after he exhibited the scratches on his back and on numerous subsequent occa-

sions before he signed his confession on the morning of the following day, that he "didn't have to say anything but it would go easy on me if I did" and that Shea said nothing whatever to him about his right to counsel; and that Shea and the other officers kept telling him about the difference between manslaughter and murder and that manslaughter is treated with leniency and is "something where you can get a pardon." Because of the findings of the trial judge and jury before whom petitioner testified and petitioner's failure to testify in this court, no weight has been given by this court to any portion of the state court record consisting of petitioner's testimony.

who gave virtually letter-perfect recitals of the *Miranda* warnings as having been given to the petitioner. on at least four occasions beginning with the first occasion soon after noticing the scratches on petitioner's neck. But it developed at the hearing that Shea had never even seen an excerpt from the *Miranda* decision before July 11, 1966 and that his only knowledge of the *Miranda* requirements was the result of an oral explanation by lawyers in the District Attorney's office to which he was assigned. Lieut. Shea's testimony in this court about constitutional warnings given the petitioner was the final improvement on his testimony in the state court, where he started off in his testimony at the voir dire by stating, "I told him that he was entitled to be represented at all times by counsel. I told him that he could remain silent, and if he said anything it could be used against him and I asked him if he would voluntarily take a lie detector test that day." After having been asked leading questions in the state court, Shea added to his testimony the required advice about petitioner's entitlement to the presence of an attorney at the interrogation and the right to court-appointed counsel if he could not afford to engage an attorney of his own. In this court, Shea would not concede on cross-examination that the events of July 11, 1966 were fresher in his mind in September 1966 than they were in 1970, despite the fact that he was unable to recall various aspects of his testimony at the state court trial.

At the evidentiary hearing in this court, Lieut. Shea testified that he had refreshed his recollection from a memorandum and notes made by officers Doyle and Tisdel, which he believed were in the Springfield Police Headquarters. However, none of the three officers brought the papers with them to the hearing and the prosecuting attorney knew nothing about them. Witnesses Doyle and Tisdel were not called by the Commonwealth although present in the witness room while Shea was testifying. The court infers that they would stand by their testimony as given in the state court, where both testified to all of the constitutional warnings given by Shea to petitioner on the morning of July 11 and neither made reference to any advice to petitioner that counsel would be appointed for him if he could not afford one and that counsel could be with him during the interrogation.

■ The court adopts the version of events recounted by officers Doyle and Tisdel in the state court and that given by Lieut. Shea when he first testified about the subject in the state court and rejects the unpersuasive amplification of Shea's testimony offered in this court.[4] The court concludes that the Springfield police ignored the "absolute necessity", Orozco v. Texas, *supra*, 394 U.S. at 326, 89 S.Ct. 1095, of giving the complete, fourfold warnings explicitly required by the *Miranda* decision and thereby violated petitioner's rights under the Fifth Amendment to the Constitution of the United States.

At oral argument following the submission of briefs the District Attorney suggested for the first time that full constitutional warnings which may have been given on the evening of July 11, about ten hours after the first warnings given on that morning, would cure any deficiencies in the advice given in the morning. No precedent was cited in support of this proposition which is contrary to the plain language of the

4. · It is no wonder that Shea's explanation to petitioner of his constitutional rights on the morning of July 11, 1966 was imprecise and inadequate in view of his never having received from any superior a written statement of the *Miranda* safeguards which had been enunciated by the Supreme Court of the United States four weeks before. The court takes judicial notice of the fact that even today, more than four years after the *Miranda* decision, federal investigating agents do not rely upon their memories but read from a printed card when advising a person being interrogated about his constitutional rights to remain silent and to have the immediate assistance of counsel.

*Miranda* case and to the holding in Westover v. United States, one of the four cases decided by the *Miranda* opinion, at 384 U.S. 494–497, 86 S.Ct. 1602. Although the petitioner did not finally confess until late that night and may well have been given complete warnings before he started dictating a confession, these came after he had traveled from Springfield to Boston, a distance of about 85 miles, to take a lie detector test, which he was told he had flunked and, as stated in the dissenting opinion in the Supreme Judicial Court, had proceeded into a state of inescapable involvement. See generally, George, The Fruits of Miranda: Scope of the Exclusionary Rule, 1967, 39 U. of Col.L.Rev. 478, 492–494.

 The third issue framed for the evidentiary hearing, whether petitioner waived his constitutional rights, has been mooted by the court's decision that he was never told what they were. A person cannot waive rights which he may not know he has. The fact that a person being interrogated may be aware of his rights without warnings being given is immaterial. Anyone held for questioning at a police station has the right to be advised explicitly of the safeguards established by Miranda v. Arizona. As therein explained, at 468–469, 86 S.Ct. at 1625:

> "The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clearcut fact. More important, whatever the background of the person interrogated, a warning at the time of the interrogation is indispensable to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time."

Parenthetically, it is basic that a valid waiver will not be presumed from failure to ask for a lawyer or from the fact that a confession was eventually obtained. "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Miranda v. Arizona, *supra* at 475, 86 S.Ct. at 1628.

Accordingly, petitioner's motion to. suppress all statements made by him on July 11, 1966 and during the early morning hours of July 12, including his confessions and the sketch of the scene of the crime which he drew, should have been allowed. Petitioner's admissions on those days were important evidence against him at the trial leading to his conviction. Therefore he is in custody of the respondent Superintendent of the Massachusetts Correctional Institution at Walpole in violation of the Constitution of the United States, 28 U.S.C. § 2241(c) (3), and a writ of habeas corpus ordering his release from custody will issue unless he is timely retried without the use of tainted evidence.