Michael A. BORODINE, Petitioner,

v.

Edward DOUZANIS, Respondent.

No. CA 77–749–T.

United States District Court,
D. Massachusetts.

Aug. 9, 1978.

Barry M. Haight, Milton, Mass., Howard J. Alperin, Boston, Mass., for petitioner.

Robert V. Greco, Asst. Atty. Gen., Boston, Mass., for respondent.

## MEMORANDUM

TAURO, District Judge.

On May 15, 1975 petitioner was convicted in the Middlesex Superior Court of murder in the first degree and sentenced to life imprisonment. Petitioner's conviction was affirmed by the Supreme Judicial Court[1] and his subsequent petition for a writ of certiorari to the United States Supreme Court was denied. He now seeks a writ of habeas corpus[2] challenging the constitutionality of his conviction on the grounds that:

1) Before he received any warning as to his constitutional rights he made incriminating statements, later used at trial, during a custodial interview.

2) After being apprised of his rights, he made additional incriminatory statements, used at trial, without having waived such rights knowingly and voluntarily.

3) He was deprived of his right to a fair trial by prejudicial remarks made by the prosecutor during closing argument.

## I.

Testimony at the suppression hearing and at trial disclosed the following sequence of events. At about 3:00 p. m. on May 17, 1974, petitioner's girlfriend, Joan, was found dead at the foot of the cellar stairs in the basement of her parents' home in Newton. She suffered substantial injuries "consistent with being punched, struck by an iron, kicked by a shod foot, and strangled with a cord." *Commonwealth v. Borodine,* Mass.Adv.Sh. (1976) 2156, 353 N.E.2d 649, 651.

Earlier that day, at about 11:30 a. m., petitioner had come to the house in Newton to visit Joan, who was still at work at the time. While waiting for her return, petitioner watched television and lunched with her sister-in-law, Judith. They were the only adults on the premises during that period.

Shortly before Joan's return, petitioner went out into the backyard, where Judith was sunning herself, and asked if the maid were home. Judith replied that she was not. When petitioner said he had heard a noise in the house, Judith commented that it was probably the wind. When Joan returned at about 1:15, she and petitioner talked alone in the house, while Judith remained out in the yard with her son. Approximately one-half hour before Joan was found dead in the basement, Judith again saw petitioner in the backyard for a brief period of time, this time accompanied by Joan.

At about 3:00, Judith came in from the backyard to watch a television program. Upon entering the house, she heard a loud crash. She immediately turned her head

1. Mass.Adv.Sh. (1976) 2156, 353 N.E.2d 649. 2. 28 U.S.C. § 2254.

and saw petitioner standing at the head of the cellar stairs. She followed him as he ran to the bottom of the steps where Joan lay battered and lifeless. Petitioner said, "I told you someone was in the house," and instructed Judith to call the police.

When Judith returned, petitioner told her that he and Joan had just had a fight and that he had gone out the front door. Judith noticed that petitioner had moved Joan's body and that he had dried blood on his bare chest. Petitioner asked Judith whether she had seen anyone go out the back door and added that he had not seen anyone go out the front. Judith testified that although she was somewhat hysterical at the time, petitioner was quite calm and his tone was conversational.

Within several minutes, Newton police officers Wargin and Peterson arrived at the house, where they found Judith waiting outside with her young son. She directed them to the cellar saying, "She's downstairs in the cellar covered with blood. I think they had a fight."

Wargin proceeded downstairs where he saw petitioner kneeling beside the victim. He observed a steam iron with a bloody handle and an Air Force bag showing bloodstains beside the victim. Petitioner asked Wargin to help Joan, but on examining her, Wargin found no vital signs. Wargin asked petitioner to accompany him into the adjoining laundry room so they would not be in the immediate vicinity of the body. The room was small, approximately half the size of the basement, and contained the usual laundry and household equipment. It was a warm afternoon and the temperature in the basement was about 80 degrees. Light came from a window in the room and from a bare electric bulb hanging overhead. Petitioner was naked from the waist up and there was blood on his upper torso and on his hands.

On entering the room, Wargin asked petitioner to be seated. He then asked him who he was, what his relationship was to Joan, and what had happened to her. Petitioner appeared upset and nervous to Wargin. He suggested to petitioner that he go over to a sink to wash his hands and face. Petitioner did so and then proceeded to answer the officer's inquiries in a calm tone of voice. He stated that he and Joan had been planning to marry and that while they were having a cup of tea that day they had had an argument over the adoption of black children. He explained that they had cursed at each other and Joan had left in a huff. He finished his tea and then went looking for her, calling out her name. He went down into the cellar where he found her lying in a crouched position from which he removed her to the position, facing up, in which she then lay.

The interview lasted approximately ten minutes. It was interrupted at about 3:25 p. m. by the arrival of Lieutenant Duffy and other officers. Before joining petitioner and Wargin in the laundry room, Duffy inspected the body and the scene of the crime. He observed that the girl's body was badly battered and bruised with a sharp indentation in the head. He noted further that the iron lying near the body had long strands of hair in it of the same color as the victim's. He checked upstairs where he noticed that the sink in the lavatory off the hall had blood in it. He also observed a broken thermos bottle on the floor near a dish cabinet in the hallway leading from the lavatory toward the cellar steps.

When he entered the laundry room Duffy gave petitioner his *Miranda* warnings and questioned him on his activities since entering the house earlier that day. Petitioner said that he would tell the officer anything he wanted to know. Petitioner again related that he had arrived at the house earlier that day, had waited for Joan's arrival, and had later argued with her over her intention to adopt black children once they were married. During this second round of questioning, however, petitioner added that, after the argument had continued for a while, he left the house. He stated that he had taken a walk up to the square in Newtonville for ten or fifteen minutes. On his return he had looked for Joan on the first floor but couldn't find her. He sat in the

kitchen for a time, where he took off his shirt, and then began to yell for Joan. When he got no response he started down to the cellar to look for her, but came back up the steps to turn on the light switch on the outside wall. As he turned on the light at the top of the stairs he saw Joan lying at the bottom. At that time Joan's sister-in-law came in and petitioner said that he asked her to call the police, while he repositioned the body.

Duffy felt that petitioner was calm and coherent during the questioning. He noticed that petitioner's nails were bitten and he asked petitioner how he had received the scratch on his face. Petitioner answered that he didn't realize he had a scratch.

While Duffy questioned petitioner, four other officers came in and out of the room at different intervals. One of them (Cox) asked petitioner several questions when Duffy was out of the room. The combined interrogations by Duffy and Cox lasted for approximately one hour, during which time petitioner steadfastly denied that he had anything to do with Joan's death. When asked if he could help give an explanation of what had happened, he answered, "Boy, I'm in a lot of trouble. I don't know what happened." Transcript, vol. I, at 124. He asked if Cox thought he was responsible. Cox replied "That is what I am here to find out." *Id.* Petitioner then asked if Cox would contact petitioner's father. He asked Cox to tell his father that he was in a lot of trouble and to get a "damned good lawyer." *Id.* at 102.

Officer Duffy then readvised petitioner of his *Miranda* rights by giving him a card with the warnings written on it. Petitioner indicated that he understood his rights and signed the card. He was placed under arrest and taken to the stationhouse.

## II.

Petitioner's claim that the statements made to Wargin should be suppressed turns on whether Wargin's questioning is deemed custodial interrogation.

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Su-

preme Court held that the prosecution cannot use statements given by a defendant during custodial interrogation unless the defendant was given warnings effective to secure his privilege against self-incrimination. The Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. at 1612.

The Court explained that custodial interrogation triggered the need for prophylactic warnings because "(i)t is at this point that our adversary system of criminal proceedings commences, distinguishing itself at the outset from the inquisitorial system recognized in some countries." *Id.* at 477, 86 S.Ct. at 1629. The Court emphasized, however, that its decision was not intended to hinder the efforts of the police in investigating crime.

> General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. . . . In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.

*Id.* at 477–78, 86 S.Ct. at 1629.

The line between custodial interrogation and on-the-scene questioning is not a clear one. Locus is not the decisive factor. In *Miranda* the defendants were held incommunicado in police stations, but the Court has extended its mandate to an early morning interrogation of a defendant in his own apartment. *Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). Lacking a general rule by which to distinguish between custodial and non-custodial interrogations, courts have necessarily determined this issue on an ad hoc basis. *United States v. Carollo,* 507 F.2d 50 (5th Cir. 1973). In doing so, the Fifth Circuit considers the following factors:

1) Probable cause for arrest at the time of questioning;

2) Subjective intent of the police;

3) Subjective belief of the defendant;

4) Focus of the investigation.

See *United States v. Carollo, supra* at 52. Examination of these factors leads to the conclusion that the interrogation here was not custodial in nature.

■ Subjective intent of either the defendant or police is not a relevant consideration in this circuit. See *Fisher v. Scafati*, 314 F.Supp. 929 (D.Mass.1970), *aff'd* 439 F.2d 307 (1st Cir.), *aff'd in part, rev'd in part* 403 U.S. 939, 91 S.Ct. 2256, 29 L.Ed.2d 719 (1971). Custody, in the *Miranda* sense, requires some "objective manifestation that the defendant was 'deprived of his freedom of action in [a] significant way.'" *Fisher v. Scafati, supra*, 439 F.2d 307, 310.

The remaining two facts, probable cause to arrest and focus of investigation, have no application to petitioner's case. Wargin clearly did not have probable cause to arrest petitioner, nor had the investigation yet focused on him. All Wargin knew on entering the basement was that someone had been hurt. Judith had met him on the lawn outside the house and had told him, "She's down in the cellar covered with blood. I think they have had a fight." Wargin had no way of knowing who "she" was or the identity of the person with whom "she" had supposedly fought. On going downstairs, Wargin saw petitioner kneeling over the body requesting help for the victim. These observations did not provide Wargin with sufficient facts to arrest petitioner or even to focus upon him as a suspect. His questions to petitioner were general, routine and necessary to preliminary investigation. He asked petitioner who he was, where he lived, the nature of his relationship to the victim, and what had happened.

Moreover, in the recent cases of *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) and *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), the Supreme Court rejected the

argument that focus is an element of custody for *Miranda* purposes.[3] In *Beckwith* the Court held that *Miranda* does not apply to the questioning of a suspect who was "neither arrested nor detained against his will", 425 U.S. at 344, 96 S.Ct. at 1615, even though a tax investigation had focused on him at the time federal revenue agents interviewed him at his home. The Court emphasized that it is the "compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time [of] questioning" which triggers the requirement of *Miranda* warnings. *Id.* at 346, 96 S.Ct. at 1616, *quoting United States v. Caiello*, 420 F.2d 471, 473 (2d Cir. 1969).

The Court also refused to find that the defendant in *Oregon v. Mathiason, supra*, had been placed in custody for *Miranda* purposes. There, the defendant voluntarily went down to the police station in response to a written note from one of the officers. He was told he was not under arrest and agreed to answer questions. The defendant was the only person named by the victim of the crime as a possible suspect. The Supreme Court nonetheless refused to categorize the interview at the stationhouse as custodial.

Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the . . . questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which *Miranda*

---

**3.** In *Miranda*, the Court defined the term "focus" by explaining that an investigation only focuses on an accused at the time the suspect is deprived of his freedom in a significant way.

384 U.S. at 444, n.4, 86 S.Ct. 1602. *See also Beckwith v. United States*, 425 U.S. 341, 347, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976).

by its terms was made applicable and to which it is limited.

*Id.,* 429 U.S. at 495, 97 S.Ct. at 714.

No evidence was introduced at the suppression hearing showing that petitioner was deprived of his freedom of action in any significant way. The fact that he was questioned in a separate room off the basement does not of itself signify that petitioner was subject to physical restraint. Wargin suggested they go into the adjoining laundry room in order to avoid having to talk within the immediate vicinity of the battered, lifeless body of the victim. Petitioner voluntarily accompanied him. Wargin did not close or lock the door or in any way indicate that petitioner could not leave the premises. Petitioner was not under arrest and could have left the room at any time.

Petitioner asserts that when a suspect is moved from the place of the initial encounter with the police and taken to another room for the purpose of questioning, the suspect is then taken into custody for *Miranda* purposes. In the three cases cited by petitioner,[4] however, the defendants were taken into special rooms at border crossings or airports and frisked or strip-searched in an isolated and clearly coercive environment.

Wargin's interview with petitioner, on the other hand, was far from coercive. He did not approach petitioner except to kneel beside the chair on which petitioner sat and suggest that it might help petitioner calm down to wash his face and hands.

■ Furthermore, the atmosphere was not a coercive one. Wargin's behavior was not "such as to overbear petitioner's will to resist and bring about [a confession] not freely self-determined." *Beckwith v. United States,* 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976),[5] *quoting Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). Petitioner was familiar with his surroundings. Although he appeared upset to Wargin, his tone was conversational and calm in his responses. This court is satisfied that petitioner's statements to Wargin were made voluntarily and that his interview with Wargin did not amount to custodial interrogation.

### III.

Petitioner does not dispute the trial court's finding that, prior to his interrogation, Duffy identified himself as a policeman and read petitioner his *Miranda* rights. He then asked petitioner if he was willing to talk. Petitioner replied that he would tell Duffy anything he wanted to know.

■ Petitioner now contends that he did not knowingly and freely waive his rights, and that his statements were the product of psychological coercion. He asserts that he was highly nervous and upset while being

---

**4.** *United States v. Salinas,* 439 F.2d 376 (5th Cir. 1971) (defendant taken to separate room at border and strip-searched); *United States v. De La Cruz,* 420 F.2d 1093 (7th Cir. 1970) (defendant taken to special interrogation room at airport and frisked); *United States v. Berard,* 281 F.Supp. 328 (D.Mass.1968) (defendant detained by customs officer in separate room and strip-searched).

**5.** Although petitioner's statement to Wargin was not a true confession in the sense of an outright admission of culpability, it was certainly incriminating within the *Miranda* Court's definition of that term.

> The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements alleged to be merely "exculpatory." If a statement were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication.

384 U.S. at 476–77, 86 S.Ct. at 1629.

Here the inculpatory effect of petitioner's statement to Wargin can be gauged by comparing that statement with the one later given to Duffy. In the version of the story petitioner told Wargin, he omitted any reference to the walk into Newtonville he later asserted he took prior to discovering Joan's dead body. This discrepancy did not escape the prosecutor, who brought it to the jury's attention in closing argument.

questioned in an unusually warm room, surrounded by three or four police officers. Furthermore, he argues that he could not make a knowing waiver inasmuch as he was never informed that Joan was dead and that he was suspected of murder. Upon examination of the "totality of all the surrounding circumstances", *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973), this court is satisfied that petitioner's waiver and subsequent statements were voluntary. Petitioner was a twenty-three year old high school graduate with training in computer programming. Duffy testified that he appeared calm and spoke coherently. The temperature in the room was around 80 degrees, approximately the same temperature as outside. When Duffy read petitioner his rights, there were only two policemen in the room, Duffy and Wargin. Moreover, Wargin had just introduced petitioner to Duffy as "the boyfriend of the dead girl", so that petitioner had every reason to believe that Joan was dead and that the police were making inquiries in order to ascertain whether the death had been accidental or the result of foul play.[6]

## IV.

Petitioner argues that he was deprived of his constitutional right to a fair trial by four prejudicial comments made by the prosecutor in his closing argument. It is asserted that three of the remarks were indirect comments on the fact that petitioner did not testify at trial, and, as such, violated the rule in *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), prohibiting adverse comment on a criminal defendant's fifth amendment right to remain silent.

■ A remark violates the proscription against adverse comment on a criminal defendant's right not to testify when the "language used was manifestly intended or was of such [a] character that the jury would naturally and necessarily take it to be a comment on the failure of the accused" to

take the stand. *Lussier v. Gunter*, 552 F.2d 385, 389 (1st Cir. 1977), quoting *Knowles v. United States*, 224 F.2d 168, 170 (10th Cir. 1955).

Petitioner objects to the prosecutor's statement that

> This girl did not have an enemy in the world. If she did, you would have heard about it, that is for sure.

Defense counsel objected and the trial judge advised the jury that the defense did not have to produce any witnesses and that they should therefore disregard the remark.

■ This comment did not focus, directly or indirectly, on the defendant's silence. Evidence of hostile acquaintances of the victim could have been brought out through various witnesses connected with the deceased. Nor did the comment necessarily suggest that petitioner was obliged to produce witnesses. No evidence of personal enemies of the victim was brought by the defense during cross-examination of her mother, brother or sister-in-law. Any possible prejudice to the defense, stemming from the prosecution's remark, was cured by the trial court's prompt instruction to the jury. *See Desmond v. United States*, 345 F.2d 225 (1st Cir. 1965).

The second remark which petitioner argues infringed upon his constitutional right not to testify related to petitioner's knowledge of his own guilt.

> He knows, he knows, ladies and gentlemen of the jury, that he is guilty. He knows it. He is sitting there . . . .. At this time, ladies and gentlemen of the jury, he knows as he sits there, you know from the evidence that you have heard . . . that he knew what had happened to that girl . . . .. [I]t is obviously apparent to anybody what happened to that girl.

■ This court does not interpret the comment as a reference to the fact that petitioner did not testify. Rather, the remark refers to the prosecutor's perception of petitioner's demeanor and state of mind

**6.** Petitioner's argument that the statement given Duffy should have been excluded as the poisonous fruit of his interview with Wargin

fails in light of this court's finding that the questioning by Wargin did not amount to custodial interrogation. *See* Section II, *supra*.

during closing argument. As the Supreme Court noted in *Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974),

a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

This remark did not infringe on petitioner's specific guarantees under the Bill of Rights, *see Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), nor was it so inherently prejudicial as to deprive petitioner of due process. As the Supreme Judicial Court noted in its review of petitioner's case, "[a]n argument that the defendant 'knows' he is guilty [adds] little to the force of a prosecutor's argument." 353 N.E.2d at 655.

The third comment to which petitioner objects as violative of his fifth amendment privilege against self-incrimination was the prosecutor's closing remark.

I shall respectfully submit to you, ladies and gentlemen of the jury, that this man, Michael Borodine, who you saw through the course of this trial just sit there. He's as calm as he can be, he never has had [sic] a shred of remorse from the beginning right up until now.

■ As the Commonwealth conceded during argument before the Supreme Judicial Court, this remark was highly improper. It was not, however, unconstitutionally prejudicial. The comment is not one which the jury would "naturally and necessarily"

take as a reference to petitioner's failure to testify. *Lussier v. Gunter, supra* at 389. The comment would more likely be taken as a comment on petitioner's expressionless courtroom demeanor rather than on his failure to take the stand. *Bishop v. Wainwright*, 511 F.2d 664, 668 (5th Cir. 1975), *cert. denied*, 425 U.S. 980, 96 S.Ct. 2186, 48 L.Ed.2d 806 (1976).[7] *See also Hayes v. United States*, 368 F.2d 814 (9th Cir. 1966).

Even assuming the remarks were interpreted as coming within the class of comment prohibited by the fifth amendment, the trial judge's instructions to the jury on the defendant's right not to take the stand rendered the remarks "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Lussier v. Gunter, supra* at 389. The prosecutor ended his argument with these remarks. Defense counsel did not object immediately but soon afterward approached the bench and moved for a mistrial. Although the comment "could and preferably should have been dealt with by an immediate, *sua sponte* instruction", *Lussier v. Gunter, supra* at 389, the thoroughness of the later instructions substantially mitigated whatever prejudicial impact the comment may have had in sharpening the jury's awareness of petitioner's failure to take the stand. *Id.*[8]

■ The fourth prosecutorial comment of which petitioner complains also fails to present error of constitutional dimension. In his closing argument, the prosecutor stated to the jury:

Several witnesses, if they were permitted, Lieutenant Duffy, Doctor Bigelow

---

7. The prosecutor's comment in *Bishop* was very similar to the remarks made by the prosecutor in the case at hand:

Look at [the defendant's] attitude during the week. Have you seen one little ounce of remorse on his face, one outburst, one apparent showing of concern? He's sat there like a knot on a log through the whole trial. He didn't talk to his lawyer, hasn't said anything. He just sits there. He doesn't do anything. Absolutely nothing.

511 F.2d at 668, n.5. The Fifth Circuit Court found that these remarks raised no habeas corpus issue. 511 F.2d at 668.

This court by its decision today does not wish to suggest in any way that it considers it appropriate for the prosecution to comment on the demeanor of a defendant who does not take the stand. This court holds only that the remarks made by the prosecutor in this case, while improper, do not amount to constitutional error.

8. The trial judge not only charged the jury not to draw any unfavorable inferences from petitioner's failure to testify, but also instructed the jury to disregard any statements made by the prosecutor during closing argument regarding petitioner's alleged lack of remorse.

and so on and so forth, or if they were talking to you in the lobby, would tell you that as a matter of fact he smashed her over the head with the point of an iron, but they can't say that to you.

Upon defense counsel's prompt objection, the trial court interrupted and explained to the jury that it was not to speculate as to what a witness might have said but was to be concerned solely with what a witness actually said.

 Comments to the effect that more evidence is available than was introduced are inappropriate. *See Kitchell v. United States*, 354 F.2d 715, 719 (1st Cir.), *cert. denied*, 384 U.S. 1011, 86 S.Ct. 1970, 16 L.Ed.2d 1032 (1966). As noted by the Supreme Judicial Court, however, the "remark was not a reference to facts not in evidence which the prosecutor inferred were known to him", rather it was "an artless choice of words employed by the prosecutor in an attempt to explain that the jury had to draw the ultimate conclusion from the specific facts." 353 N.E.2d at 655. Moreover, after the trial judge had instructed the jury to disregard that line of argument, the prosecutor did not continue to allude to remarks or opinions not in evidence.[9] Although highly improper, the remark was not so prejudicial that petitioner was denied his right to a fair trial.[10] The trial court's prompt and thorough instructions to the jury eliminated any possible prejudicial effect the comment may have engendered.

The petition is denied. An order has issued.

---

**9.** Compare *Kitchell v. United States*, 354 F.2d 715, 719 (1st Cir.), *cert. denied*, 384 U.S. 1011, 86 S.Ct. 1970, 16 L.Ed.2d 1032 (1966) (persistent remarks by prosecutor had effect of focusing jury's attention on evidence excluded by court).

**10.** *Compare Ginsberg v. United States*, 257 F.2d 950 (5th Cir. 1958) (argument by prosecutor that he had 50 witnesses available to contradict testimony by four defense witnesses as to defendant's good character constituted plain error obviating need for objection by defense counsel).